## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MDB COMMUNICATIONS, INC.,       :
           Plaintiff,           :
     v.                         :  Civil Case No.
                                :  05-CV-02131-PLF
HARTFORD CASUALTY INSURANCE     :
COMPANY,                        :
           Defendant.           :

Corporate Deposition of
MDB COMMUNICATIONS, INC.
By and Through its Corporate Designee
CARY HATCH
Bethesda, Maryland
Tuesday, February 28, 2006
9:25 a.m.

Job No: 1-73645
Pages 1 - 98
Reported by: Peggy L. Dingle

## Page 2

Corporate deposition of MDB COMMUNICATIONS, INC., by and through its corporate designee CARY HATCH, held at the law offices of:

PALEY, ROTHMAN, GOLDSTEIN, ROSENBERG,
   EIG & COOPER, CHARTERED
4800 Hampden Lane
Seventh Floor
Bethesda, Maryland 20814
(301) 921-0530

Pursuant to agreement, before Peggy L. Dingle, Notary Public of the State of Maryland.

## Page 3

A P P E A R A N C E S
ON BEHALF OF PLAINTIFF:
   KATHARINE O. PORWICK, ESQUIRE
   Paley, Rothman, Goldstein, Rosenberg,
      Eig & Cooper, Chartered
   4800 Hampden Lane
   Seventh Floor
   Bethesda, Maryland 20814
   (301) 921-0530

**ORIGINAL**

ON BEHALF OF DEFENDANT:
   LUCINDA E. DAVIS, ESQUIRE
   Niles, Barton & Wilmer, LLP
   111 South Calvert Street
   Suite 1400
   Baltimore, Maryland 21202
   (410) 783-6300

ALSO PRESENT: David Elmore

## Page 4

C O N T E N T S
EXAMINATION OF CARY HATCH                PAGE
   By Ms. Davis                            5

E X H I B I T S
(Attached to the Transcript)
HATCH DEPOSITION EXHIBIT                 PAGE
   1  Notice of deposition                 5
   2  Duties of Ms. Essex                  8
   3  2/8/05 handwritten note             49
   4  Missing check list                  66
   5  Check images                        66
   6  Proof of loss                       77
   7  Proof of loss                       77

**EXHIBIT D**

Page 9

1  Q  Turning to the employee who is the subject of
2  this suit in some ways, Miss Essex, do you recall when
3  Miss Essex was hired by MDB Communications?
4  A  It was May of 1999.
5  Q  Okay. And how did she come to be hired by MDB?
6  A  She was referred by another advertising
7  executive within the Washington area, another principal of
8  an advertising agency, a friendly competitor, in fact, my
9  best friend in the business.
10 Q  Still? No. That's off the record. No.
11 A  Actually, yes.
12 Q  Okay.
13 A  He is sick about this, I got to tell you.
14 Q  And what sort of qualifications did Miss -- or
15 what position was Miss Essex hired for in 1999?
16 A  As a controller for MDB Communications.
17 Q  And what qualifications did Miss Essex have for
18 that position?
19 A  She came to us as an accounting supervisor, I
20 believe, from Washington Sport and Health and managed, you
21 know, a staff there that included accounting for different
22 limited partnerships that constitute that business.

Page 10

1  Q  Do you know if she had any special training or
2  certifications or degrees in accounting or accounting work
3  in 1999?
4  A  I don't recall. Off the top of my head I
5  don't.
6  Q  Okay. Did she, in her course of her employment
7  with MDB Communications, receive further accounting
8  training or education?
9  A  She did. She actually pursued her MBA while
10 functioning as controller of MDB Communications and she
11 did receive her MBA.
12 Q  She received it while she was employed by MDB?
13 A  She did.
14 Q  Okay. In terms of other accounting training or
15 certification, did -- besides the MBA was there anything
16 else that she pursued or was offered to her while she was
17 at MDB?
18 A  Other than the four A's, which is the American
19 Association of Advertising Agencies, they provide fiscal
20 and financial guidance to their member organizations and I
21 shared that information with her, as well. So industry
22 guidelines, if you will.

Page 11

1  Q  And those are industry guidelines for
2  accounting?
3  A  Uh-huh. Yes, the fiscal management of
4  advertising agencies.
5  Q  Okay. In terms of accounting, what did those
6  guidelines say about accounting practices?
7  A  It talks about ratios. It talks about, you
8  know, industry standards in terms of accounts receivable,
9  accounts payable, other things I am -- they are not coming
10 to mind.
11 Q  In regards to those industry standards that you
12 just mentioned were -- did MDB follow all of the
13 guidelines provided by, we will call them, the four A's?
14 A  To my knowledge we did and we were within
15 industry ratios.
16 Q  And are those guidelines in printed format?
17 A  I believe so. I would have to check.
18 Q  And do they -- are they -- do they come out
19 once a year or do you know how often they are updated?
20 A  I -- I don't know the frequency. You are
21 probably aware the advertising industry has gone through
22 some shrinkage. So the regularity of those things has

Page 12

1  been erratic.
2  Q  Were those guidelines that were provided to
3  Miss Essex when she began her employment at MDB
4  Communications in 1999?
5  A  I -- well, we weren't a member of the four A's
6  in 1999. I think we joined subsequent to that. So when
7  we did become a member she was included in that
8  information. I believe we joined in 2000. I would have
9  to double check.
10 Q  Did Miss Essex have to go to any special
11 training in these practices or in following the
12 guidelines?
13 A  No, uhn-uhn, no.
14 Q  In order to join the four A's did you have
15 to -- did MDB have to provide any accounting information
16 or any information on how they practice -- how it
17 practiced accounting?
18 A  Could you restate the question?
19 Q  Sure. In order to join the four A's --
20 A  Right.
21 Q  Well, I will just ask you what was the process
22 for joining the four A's? How did MDB come to join the

Case 1:05-cv-02131-PLF   Document 12-7   Filed 04/03/2006   Page 3 of 7
DEPOSITION OF GARY FLATOW
CONDUCTED ON TUESDAY, FEBRUARY 28, 2006

12 (Pages 45 to 48)

45

1  bonuses, goes through ADP. Always has.
2  Q   Okay. In regards to Miss Essex's salary --
3  Essex's salary, was that on an hourly basis?
4  A   No.
5  Q   Okay. It was -- it was a yearly salary?
6  A   Yes, and I believe you have her employment
7  agreement, as well.
8  Q   Okay. And that sets forth the initial
9  agreement in terms of hourly -- hourly salary; is that
10 correct?
11 A   I am sorry. What was the first part of the
12 question?
13 Q   Well, you said that we have her employment
14 agreement, as well. Is it your understanding that that
15 sets forth her salary?
16 A   It represents her compensation on an annualized
17 basis.
18 Q   Okay. In 1999; is that correct?
19 A   In 1999. Sorry.
20 Q   Okay. Once you opened the bank statement on
21 February 7th, 2005 and you saw canceled checks, do you
22 recall how many canceled checks you saw in that bank

46

1  statement?
2  A   I think it was one or two.
3  Q   Okay.
4  A   I was in a state of shock, so.
5      MS. PORWICK: Objection. Do you mean canceled
6  checks written to Miss Essex --
7      MS. DAVIS: Yes.
8      MS. PORWICK: -- or canceled checks in general?
9      THE WITNESS: Oh, written to Miss Essex?
10 BY MS. DAVIS:
11 Q   Yes.
12 A   Yes. I am sorry.
13 Q   Okay. After you saw those checks, what action
14 did you take next?
15 A   I took a check into my executive vice president
16 and said, "We have a problem."
17 Q   Okay. And is that Mr. Duke that you mentioned
18 before?
19 A   Correct.
20 Q   And what did he say or what was the response?
21 A   He was shocked, as well.
22 Q   Okay. What else did you talk about when you

47

1  went in to see Mr. Duke?
2  A   I said, "I need the network shut down. I need
3  her password shut down. I need to change all the locks
4  and you are going to meet me here tomorrow at 10:00
5  o'clock and we are going to address this."
6  Q   Okay. And did you take all of those actions?
7  A   I did.
8  Q   Okay. And did you and Mr. Duke meet at 10:00
9  o'clock the next morning?
10 A   We did.
11 Q   Okay. And what happened at that point?
12 A   Marilyn came into the office. I asked Gary to
13 escort her into my office. We sat down at my conference
14 table. I showed her the check and asked her for an
15 explanation.
16 Q   Okay. And that was the check that you had
17 discovered in the bank statement?
18 A   Correct.
19 Q   Okay. And what did she tell you?
20 A   She said she didn't have an explanation and
21 then she said, "Oh, my God, I am going to lose my house.
22 Oh, my God, what is my family going to do?" I -- she

48

1  admitted to the embezzlement. I have a signed statement,
2  which I believe you also have. I have Gary Duke as my
3  witness.
4  Q   When you said she admitted to the embezzlement,
5  what did she admit?
6  A   I asked her how long this had been going on and
7  she said, "For a year."
8      And I said, "What year?"
9      And she said, "2004/2005."
10     And I said, "How much?"
11     And she said, "$100,000." And she, you know,
12 was upset and said, "What am I going to do?"
13 Q   Did she --
14 A   And I said, "That's not my problem."
15 Q   Did she explain to you how she had carried out
16 the embezzlement?
17 A   She said she committed fraud.
18 Q   Okay. Did she explain to you how she -- how
19 the -- the checks involved in the embezzlement were
20 processed or how she processed them?
21 A   No. I asked her if there were any other
22 accounts involved and she said no.

Page 49

1  Q   Okay. Since you just referred to it, I will go
2  ahead and have --
3       (Hatch Deposition Exhibit 3 was marked for
4  identification and was attached to the transcript.)
5  BY MS. DAVIS:
6  Q   Miss Hatch, I will show you what we have marked
7  as "Exhibit Number 3."
8  A   Uh-huh.
9  Q   When you talk about the admission, is this the
10 document that you were referring to?
11 A   This is the written portion.
12 Q   Okay. And is this Miss Essex's handwriting on
13 this document that says --
14 A   It is.
15 Q   -- "I, Marilyn M. Essex, have committed fraud
16 by falsifying checks"?
17 A   Yes.
18 Q   Okay. Is all the handwriting on "Exhibit
19 Number 3" Miss Essex's handwriting?
20 A   It is.
21 Q   Okay. Is this something that you asked her to
22 sign or that she volunteered to sign?

Page 50

1  A   I suggested that she memorialize what she had
2  done and she agreed.
3  Q   And then under her signature here where it
4  says, "2004 to 2005 100,000" and it looks like "approx,"
5  short for approximately, again, that's the information
6  that she told you about the theft?
7  A   It is.
8  Q   Okay. And then did she also resign on February
9  8th, as well?
10 A   She did.
11 Q   Okay. Was there anything else that you
12 discussed with Miss Essex or Mr. Duke in that meeting on
13 the morning of February 8th?
14 A   There could have been. My ability to recall
15 that is small.
16 Q   Okay.
17     THE WITNESS: Can we take a break?
18     MS. PORWICK: Yes.
19     THE WITNESS: Thanks.
20     (Thereupon, a brief break was taken, and then
21 the deposition continued as follows:)
22 BY MS. DAVIS:

Page 51

1  Q   Miss Hatch, after that meeting with Mr. Duke
2  and Marilyn Essex, did MDB take any other further
3  action -- well, did they take any other further action?
4  A   Yes. You know, I -- I consulted with my
5  attorney. I -- gosh, I am trying to remember. I -- I
6  called, left a message. Of course, bankers' hours with
7  Bank of America, because this discovery was made on -- at
8  ten minutes of 5:00 on -- on the 7th, so the ability to
9  reach my banker was zero. But subsequent to that I did
10 reach Bank of America to make them aware of what the
11 situation was. I got advice from my attorney as to how to
12 proceed. I also called the Metropolitan Police
13 Department.
14     What else did I do? There must have been --
15 there were a number of things that we employed, including
16 hiring a forensic accounting firm.
17 Q   All right.
18 A   There was lots of stuff to do.
19 Q   In regards to your call with the Metropolitan
20 Police, did anyone ever respond or was the case opened or
21 was there any investigation done by the police?
22 A   A case -- they did respond. There was a case

Page 52

1  opened. They met with me that day that I confronted her,
2  meaning February 8th. They took down information. They
3  took evidence in the form of a -- I don't know how many --
4  a check, checks and they filed a report and said they
5  would get back with me.
6  Q   That was all on February the 8th --
7  A   It was.
8  Q   -- of 2005?
9  A   Correct.
10 Q   Have you had any subsequent contact with the
11 police or --
12 A   Oh, yes.
13 Q   Okay. What other -- what other contact have
14 you had since then?
15 A   I have followed up with them over the course of
16 a year to encourage them to do their job.
17 Q   And what sort of response did you get?
18 A   They have filed a report. They have
19 contacted -- I could be wrong on the terminology here --
20 the legal system is the other system that I am not a
21 superstar in. I want to say it's the U.S. District
22 Attorney's office.

53

1  Q  Okay.
2  A  To see if they are pursuing it.
3  Q  Some sort of prosecutor?
4  A  Yes, for them to prosecute it.
5  Q  Do you know if there is a criminal case going
6  forward against Marilyn Essex at this point?
7  A  I don't know with certainty.
8  Q  Okay. Have you had any discussions with
9  anybody from the prosecutor's office?
10  A  Are you talking about that U.S.D.A. thing.
11  Q  The U.S. Attorney's office or whoever -- other
12  than the police have you had conversations or discussions
13  about this case with any other government entity?
14  A  Last -- last fall the Metropolitan Police
15  Department detective had a district attorney on the phone
16  with us, but I have yet to hear back about the outcome of
17  that, are they taking the case, are they not taking the
18  case. Who knows.
19  Q  Okay. And then you said you hired a forensic
20  accountant; is that correct, or MDB did?
21  A  Yes. Immediately after speaking with my
22  attorney he recommended a forensic accounting firm so that

54

1  we could identify to what extent this -- these
2  transgressions had transpired.
3  Q  And who was the firm that you -- that MDB ended
4  up hiring?
5  A  Ginsberg and Helfer, I believe, H-E-L-F-E-R.
6  Q  Okay. And do you recall when Ginsberg and
7  Helfer started working on investigating?
8  A  I don't know the exact date, but it was shortly
9  after the discovery.
10  Q  Within a month?
11  A  Within a -- oh, certainly within a month.
12  Q  Okay. And did they report to you directly in
13  regards to their activities in investigating?
14  A  Myself and my legal counsel. Additionally, we
15  hired another financial expert.
16  Q  And who was that?
17  A  That was Carolyn Carter.
18  Q  And why did MDB hire Carolyn Carter?
19  A  Well, two reasons. One is that Ginsberg's
20  organization wasn't moving as quickly, I felt, as I needed
21  and, secondly, she came highly recommended by a management
22  consultant that I had used, gosh, for six years or five

55

1  years, maybe, at that time, also knowing that she had been
2  a former partner at Ernst and Young.
3  Q  Is Miss Carter -- do you know if she is an
4  accountant or if she is a CPA?
5  A  Oh, yes, she has a CPA.
6  Q  Did she take over the investigation then or the
7  work that Ginsberg and Helfer were doing or did she
8  oversee it or how did that -- how -- what was their
9  relationship?
10  A  For a short period of time they worked in
11  tandem and then it became clear that she was more capable,
12  more expeditious and more cost effective to use.
13  Q  Okay. And what did -- Ginsberg and Helfer and
14  then later Carolyn Carter what did they do in regards to
15  investigating the theft by Miss Essex?
16  A  They reviewed bank statements to identify
17  checks and we have the image -- we secured the images of
18  the forged checks to compile year by year losses.
19  Q  And did they do anything else in regards to
20  investigating the loss?
21  A  That was the primary instrument. I mean, we
22  did poke around a little bit to see -- I, obviously,

56

1  verified that no company credit cards were taken, no other
2  accounts, meaning bank accounts, had been violated. I
3  mean, we verified, obviously, the existing cash balance of
4  the company.
5  Q  Okay. In regards to verifying that no other
6  bank accounts were violated, is it only that Miss Essex's
7  activities then affected the operating account?
8  A  It was solely the operating account.
9  Q  And did you find that there were no credit
10  cards or other credit accounts involved in the theft?
11  A  No other parts of the company were utilized in
12  her scheme.
13  Q  All right. In regards to -- well, is there
14  anything else that Ginsberg and Helfer or Carolyn Carter
15  or you did in regards to investigating the theft in this
16  case?
17  A  There were -- we ended up doing -- running
18  credit reports on her. We ended up, you know -- gosh, I
19  am trying to think what else we did. There may have been.
20  That's as much as I can remember.
21  Q  Okay. Just going back briefly for generally
22  how checks were written from the operating account, how

73

1  A  Uh-huh.
2  Q  -- is it your understanding that the agreement
3  with Marilyn Essex is for full payment and full
4  restitution of the money that she stole?
5  A  That's what she claimed and that's what she
6  agreed to.
7  Q  Okay. Do you have any reason to believe that
8  that's not the case?
9  A  That agreement was for the amount that she
10 claimed at that point in time to have -- these are my
11 words -- embezzled. Subsequent to that we learned that it
12 was much greater than what she had agreed to.
13 Q  So did MDB ever go back to get the additional
14 amount that it later discovered that she had stolen?
15 A  We have pursued our restitution as far as we
16 can based upon the known assets that we can discover that
17 she has to try to offset her stealing spree.
18 Q  Okay. Other -- and I believe that the assets
19 are listed in that agreement that MDB has with Marilyn
20 Essex, but other than the specific assets that are listed
21 in there, is there any other form of restitution that MDB
22 has or is currently seeking from Miss Essex, i.e. wage

74

1  attachment or any other sort of judgment or lien against
2  future assets that Miss Essex may have?
3  A  This is my cursory understanding of what is
4  legally possible. We have exhausted, to the best of my
5  understanding, every asset she has. I also understand
6  that -- and I could be wrong, that there is no way to
7  garnish wages unless you get a prosecution involved.
8  There are other legal hurdles that, apparently, have to
9  fall into place before you can do any of that. We are
10 pursuing her criminally and I will continue to pursue her
11 in any legal way I can.
12 Q  Okay. In regards to the --
13 A  Besides the fact that she is here at 1:00
14 o'clock.
15 Q  Yes, and we will get you out of here before
16 then. Do you know to date what the amount of restitution
17 is that MDB has received from Miss Essex?
18 A  I know generally and, again, my recollection of
19 exact numbers is not going to be perfect. I believe that
20 we have received approximately $276,000.
21 Q  And that, again, stems from the agreement and
22 comes from things like the sale of her house or the sale

75

1  of her car, liquidation of her 401(K) program?
2  A  It does.
3  Q  Those sorts of items?
4  A  Yes, it does.
5  Q  Okay. Other than The Hartford in this suit and
6  that agreement with Miss Essex in terms of receiving that
7  restitution, is MDB seeking to receive restitution or
8  recovery of any of the lost or stolen proceeds from any
9  other entity?
10 A  I am hopeful that I can get something towards
11 that end from Bank of America.
12 Q  And is there currently a suit by MDB against
13 Bank of America?
14 A  There is.
15 Q  Okay. Do you know how much MDB is seeking in
16 that suit?
17 A  I do not know the exact number.
18 Q  Okay. Do you know if it's for the -- I believe
19 you said there was approximately $276,000 that MDB had
20 received from Miss Essex. Do you know if the amount
21 sought from Bank of America is the balance of what Miss
22 Essex stole?

76

1  A  It is not.
2  Q  Okay. Do you know why it is not the balance?
3     MS. PORWICK: Objection: Calls for a legal
4  conclusion.
5     THE WITNESS: I am not qualified to know what
6  the legal opportunities are in terms of what we can or
7  cannot recover from Bank of America, to be honest with
8  you.
9  BY MS. DAVIS:
10 Q  Okay. Is it your understanding that you can't
11 seek the rest of it against Bank of America?
12 A  I don't think that we can.
13 Q  Okay. What -- what is the total amount that
14 Miss Essex stole from MDB Communications?
15 A  Approximately $658,000.
16 Q  And that's from 1999 through the beginning of
17 2005?
18 A  Yes.
19 Q  Other than Bank of America, The Hartford in
20 this suit or Marilyn Essex, is there anyone else that MDB
21 communications is seeking to recover any moneys from that
22 were stolen by Miss Essex?

77

1  A  No.
2  Q  Who was MDB Communications' insurer before The
3  Hartford?
4  A  I don't know.
5  Q  Okay. Did you -- did there come a point in
6  time when MDB Communications filed a claim against The
7  Hartford in regards to the money that Miss Essex stole?
8  A  Yes.
9  Q  Okay. Did MDB make a claim with its previous
10  insurer for moneys that Miss Essex stole?
11  A  No.
12  Q  Okay. I will go ahead and show you what --
13      (Hatch Deposition Exhibits 6 and 7 were marked
14  for identification and were attached to the transcript.)
15  BY MS. DAVIS:
16  Q  Miss Essex, I am showing you what we have
17  marked as "Exhibits 6 and 7" in this matter and the
18  document we have marked as "Exhibit Number 6" has about
19  midway through the top paragraph there the line starting,
20  "The true net loss from July 28, 2003 through July 28,
21  2004." Do you see -- do you see that document?
22  A  Yes.

78

1  Q  Okay. Is this a document that you have seen
2  before?
3  A  Yes, it is.
4  Q  Okay. And is that your correct signature there
5  on the signature line?
6  A  It is.
7  Q  All right. Is this a document that you
8  prepared?
9  A  This is a document that was prepared for me.
10  Q  Who prepared it for you?
11  A  Counsel.
12  Q  Okay. And is it your understanding that The
13  Hartford had a policy of insurance with MDB Communications
14  that went from July 2003 through July 2004?
15  A  Yes.
16  Q  Okay. If you will turn over on the second page
17  of that document, on the right-hand side there it says
18  "Total loss." Do you see that line?
19  A  Yes.
20  Q  And it says $153,857.47?
21  A  Correct.
22  Q  Okay. What is your understanding that that

79

1  means?
2  A  From July to -- from July to July 2003 to 2004
3  this is the aggregate number of the checks that Marilyn
4  wrote to herself dishonestly.
5  Q  Okay. So for a total loss, it's not the total
6  loss incurred by MDB Communications?
7  A  I wish it were.
8  Q  Okay. And then if you look at what we have
9  marked as "Exhibit Number 7" and, again, in the middle of
10  that first paragraph it says, "The true net loss from July
11  28, 2004 through March of 2005." Is this a document,
12  similarly, that was prepared by your attorney and that you
13  signed?
14  A  It is.
15  Q  Okay.
16  A  Additional losses include attorneys' fees,
17  accounting fees, all the time, all the trouble, all the
18  changing of the locks.
19  Q  Well, in the number that you told me before,
20  the 658,000, is that number -- is those -- are those items
21  included in that number?
22  A  Those are just the checks.

80

1  Q  Okay. And, again, on the -- what we have
2  marked as "Exhibit Number 7" it says "Total loss
3  $76,882.62." Again, is it your understanding that that's
4  just the total amount of the stolen checks?
5  A  That's correct.
6  Q  Okay. For that time frame listed on the front?
7  For, as you testified earlier, that the scheme was -- with
8  Miss Essex was going on from 1999 to 2003 -- through 2005
9  but the proofs of loss here that you signed only start in
10  2003. Did you sign any other proofs of loss for any
11  losses occurring prior to 2003?
12  A  Sign them for whom? I don't understand.
13  Q  Any prior insurer or any other insurer.
14  A  No.
15  Q  Okay. Do you know if MDB Communications had
16  insurance coverage for employee dishonesty prior to July
17  2003?
18  A  I am not sure.
19  Q  Okay. Do you know why no other insurer has
20  been -- well, strike that. Is it your testimony that no
21  other insurer other than The Hartford has been -- that MDB
22  has not filed a claim other than with The Hartford and --