## Page 1

```
IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF COLUMBIA

MDB COMMUNICATIONS, INC.,    :
                             :
         Plaintiff,          :
                             :
    v.                       :  Civil Case No.
                             :  05-CV-02131-PLF
HARTFORD CASUALTY INSURANCE  :
COMPANY,                     :
                             :
         Defendant.          :
```

              Corporate Deposition of
              MDB COMMUNICATIONS, INC.
           By and Through its Corporate Designee
                    CARY HATCH
                  Bethesda, Maryland
              Tuesday, February 28, 2006
                      9:25 a.m.

Job No: 1-73645
Pages 1 - 98
Reported by: Peggy L. Dingle

## Page 2

    Corporate deposition of MDB COMMUNICATIONS, INC., by and through its corporate designee CARY HATCH, held at the law offices of:

    PALEY, ROTHMAN, GOLDSTEIN, ROSENBERG,
       EIG & COOPER, CHARTERED
    4800 Hampden Lane
    Seventh Floor
    Bethesda, Maryland  20814
    (301) 921-0530

    Pursuant to agreement, before Peggy L. Dingle, Notary Public of the State of Maryland.

## Page 3

                    A P P E A R A N C E S
ON BEHALF OF PLAINTIFF:
    KATHARINE O. PORWICK, ESQUIRE
    Paley, Rothman, Goldstein, Rosenberg,
      Eig & Cooper, Chartered
    4800 Hampden Lane
    Seventh Floor
    Bethesda, Maryland  20814
    (301) 921-0530

**ORIGINAL**

ON BEHALF OF DEFENDANT:
    LUCINDA E. DAVIS, ESQUIRE
    Niles, Barton & Wilmer, LLP
    111 South Calvert Street
    Suite 1400
    Baltimore, Maryland  21202
    (410) 783-6300

    ALSO PRESENT:  David Elmore

## Page 4

                    C O N T E N T S
EXAMINATION OF CARY HATCH                           PAGE
    By Ms. Davis                           5


                    E X H I B I T S
            (Attached to the Transcript)
HATCH DEPOSITION EXHIBIT                            PAGE
    1   Notice of deposition                5
    2   Duties of Ms. Essex                 8
    3   2/8/05 handwritten note            49
    4   Missing check list                 66
    5   Check images                       66
    6   Proof of loss                      77
    7   Proof of loss                      77

**EXHIBIT 10**

9

Q   Turning to the employee who is the subject of this suit in some ways, Miss Essex, do you recall when Miss Essex was hired by MDB Communications?

A   It was May of 1999.

Q   Okay. And how did she come to be hired by MDB?

A   She was referred by another advertising executive within the Washington area, another principal of an advertising agency, a friendly competitor, in fact, my best friend in the business.

Q   Still? No. That's off the record. No.

A   Actually, yes.

Q   Okay.

A   He is sick about this, I got to tell you.

Q   And what sort of qualifications did Miss -- or what position was Miss Essex hired for in 1999?

A   As a controller for MDB Communications.

Q   And what qualifications did Miss Essex have for that position?

A   She came to us as an accounting supervisor, I believe, from Washington Sport and Health and managed, you know, a staff there that included accounting for different limited partnerships that constitute that business.

10

Q   Do you know if she had any special training or certifications or degrees in accounting or accounting work in 1999?

A   I don't recall. Off the top of my head I don't.

Q   Okay. Did she, in her course of her employment with MDB Communications, receive further accounting training or education?

A   She did. She actually pursued her MBA while functioning as controller of MDB Communications and she did receive her MBA.

Q   She received it while she was employed by MDB?

A   She did.

Q   Okay. In terms of other accounting training or certification, did -- besides the MBA was there anything else that she pursued or was offered to her while she was at MDB?

A   Other than the four A's, which is the American Association of Advertising Agencies, they provide fiscal and financial guidance to their member organizations and I shared that information with her, as well. So industry guidelines, if you will.

11

Q   And those are industry guidelines for accounting?

A   Uh-huh. Yes, the fiscal management of advertising agencies.

Q   Okay. In terms of accounting, what did those guidelines say about accounting practices?

A   It talks about ratios. It talks about, you know, industry standards in terms of accounts receivable, accounts payable, other things I am -- they are not coming to mind.

Q   In regards to those industry standards that you just mentioned were -- did MDB follow all of the guidelines provided by, we will call them, the four A's?

A   To my knowledge we did and we were within industry ratios.

Q   And are those guidelines in printed format?

A   I believe so. I would have to check.

Q   And do they -- are they -- do they come out once a year or do you know how often they are updated?

A   I -- I don't know the frequency. You are probably aware the advertising industry has gone through some shrinkage. So the regularity of those things has

12

been erratic.

Q   Were those guidelines that were provided to Miss Essex when she began her employment at MDB Communications in 1999?

A   I -- well, we weren't a member of the four A's in 1999. I think we joined subsequent to that. So when we did become a member she was included in that information. I believe we joined in 2000. I would have to double check.

Q   Did Miss Essex have to go to any special training in these practices or in following the guidelines?

A   No, uhn-uhn, no.

Q   In order to join the four A's did you have to -- did MDB have to provide any accounting information or any information on how they practice -- how it practiced accounting?

A   Could you restate the question?

Q   Sure. In order to join the four A's --

A   Right.

Q   Well, I will just ask you what was the process for joining the four A's? How did MDB come to join the

**Page 45**

1  bonuses, goes through ADP. Always has.
2  Q  Okay. In regards to Miss Essex's salary --
3  Essex's salary, was that on an hourly basis?
4  A  No.
5  Q  Okay. It was -- it was a yearly salary?
6  A  Yes, and I believe you have her employment
7  agreement, as well.
8  Q  Okay. And that sets forth the initial
9  agreement in terms of hourly -- hourly salary; is that
10  correct?
11  A  I am sorry. What was the first part of the
12  question?
13  Q  Well, you said that we have her employment
14  agreement, as well. Is it your understanding that that
15  sets forth her salary?
16  A  It represents her compensation on an annualized
17  basis.
18  Q  Okay. In 1999; is that correct?
19  A  In 1999. Sorry.
20  Q  Okay. Once you opened the bank statement on
21  February 7th, 2005 and you saw canceled checks, do you
22  recall how many canceled checks you saw in that bank

**Page 46**

1  statement?
2  A  I think it was one or two.
3  Q  Okay.
4  A  I was in a state of shock, so.
5      MS. PORWICK: Objection. Do you mean canceled
6  checks written to Miss Essex --
7      MS. DAVIS: Yes.
8      MS. PORWICK: -- or canceled checks in general?
9      THE WITNESS: Oh, written to Miss Essex?
10  BY MS. DAVIS:
11  Q  Yes.
12  A  Yes. I am sorry.
13  Q  Okay. After you saw those checks, what action
14  did you take next?
15  A  I took a check into my executive vice president
16  and said, "We have a problem."
17  Q  Okay. And is that Mr. Duke that you mentioned
18  before?
19  A  Correct.
20  Q  And what did he say or what was the response?
21  A  He was shocked, as well.
22  Q  Okay. What else did you talk about when you

**Page 47**

1  went in to see Mr. Duke?
2  A  I said, "I need the network shut down. I need
3  her password shut down. I need to change all the locks
4  and you are going to meet me here tomorrow at 10:00
5  o'clock and we are going to address this."
6  Q  Okay. And did you take all of those actions?
7  A  I did.
8  Q  Okay. And did you and Mr. Duke meet at 10:00
9  o'clock the next morning?
10  A  We did.
11  Q  Okay. And what happened at that point?
12  A  Marilyn came into the office. I asked Gary to
13  escort her into my office. We sat down at my conference
14  table. I showed her the check and asked her for an
15  explanation.
16  Q  Okay. And that was the check that you had
17  discovered in the bank statement?
18  A  Correct.
19  Q  Okay. And what did she tell you?
20  A  She said she didn't have an explanation and
21  then she said, "Oh, my God, I am going to lose my house.
22  Oh, my God, what is my family going to do?" I -- she

**Page 48**

1  admitted to the embezzlement. I have a signed statement,
2  which I believe you also have. I have Gary Duke as my
3  witness.
4  Q  When you said she admitted to the embezzlement,
5  what did she admit?
6  A  I asked her how long this had been going on and
7  she said, "For a year."
8      And I said, "What year?"
9      And she said, "2004/2005."
10      And I said, "How much?"
11      And she said, "$100,000." And she, you know,
12  was upset and said, "What am I going to do?"
13  Q  Did she --
14  A  And I said, "That's not my problem."
15  Q  Did she explain to you how she had carried out
16  the embezzlement?
17  A  She said she committed fraud.
18  Q  Okay. Did she explain to you how she -- how
19  the -- the checks involved in the embezzlement were
20  processed or how she processed them?
21  A  No. I asked her if there were any other
22  accounts involved and she said no.

**Page 49**

1  Q  Okay. Since you just referred to it, I will go
2  ahead and have --
3      (Hatch Deposition Exhibit 3 was marked for
4  identification and was attached to the transcript.)
5  BY MS. DAVIS:
6  Q  Miss Hatch, I will show you what we have marked
7  as "Exhibit Number 3."
8  A  Uh-huh.
9  Q  When you talk about the admission, is this the
10 document that you were referring to?
11 A  This is the written portion.
12 Q  Okay. And is this Miss Essex's handwriting on
13 this document that says --
14 A  It is.
15 Q  -- "I, Marilyn M. Essex, have committed fraud
16 by falsifying checks"?
17 A  Yes.
18 Q  Okay. Is all the handwriting on "Exhibit
19 Number 3" Miss Essex's handwriting?
20 A  It is.
21 Q  Okay. Is this something that you asked her to
22 sign or that she volunteered to sign?

**Page 50**

1  A  I suggested that she memorialize what she had
2  done and she agreed.
3  Q  And then under her signature here where it
4  says, "2004 to 2005 100,000" and it looks like "approx,"
5  short for approximately, again, that's the information
6  that she told you about the theft?
7  A  It is.
8  Q  Okay. And then did she also resign on February
9  8th, as well?
10 A  She did.
11 Q  Okay. Was there anything else that you
12 discussed with Miss Essex or Mr. Duke in that meeting on
13 the morning of February 8th?
14 A  There could have been. My ability to recall
15 that is small.
16 Q  Okay.
17    THE WITNESS: Can we take a break?
18    MS. PORWICK: Yes.
19    THE WITNESS: Thanks.
20    (Thereupon, a brief break was taken, and then
21 the deposition continued as follows:)
22 BY MS. DAVIS:

**Page 51**

1  Q  Miss Hatch, after that meeting with Mr. Duke
2  and Marilyn Essex, did MDB take any other further
3  action -- well, did they take any other further action?
4  A  Yes. You know, I -- I consulted with my
5  attorney. I -- gosh, I am trying to remember. I -- I
6  called, left a message. Of course, bankers' hours with
7  Bank of America, because this discovery was made on -- at
8  ten minutes of 5:00 on -- on the 7th, so the ability to
9  reach my banker was zero. But subsequent to that I did
10 reach Bank of America to make them aware of what the
11 situation was. I got advice from my attorney as to how to
12 proceed. I also called the Metropolitan Police
13 Department.
14    What else did I do? There must have been --
15 there were a number of things that we employed, including
16 hiring a forensic accounting firm.
17 Q  All right.
18 A  There was lots of stuff to do.
19 Q  In regards to your call with the Metropolitan
20 Police, did anyone ever respond or was the case opened or
21 was there any investigation done by the police?
22 A  A case -- they did respond. There was a case

**Page 52**

1  opened. They met with me that day that I confronted her,
2  meaning February 8th. They took down information. They
3  took evidence in the form of a -- I don't know how many --
4  a check, checks and they filed a report and said they
5  would get back with me.
6  Q  That was all on February the 8th --
7  A  It was.
8  Q  -- of 2005?
9  A  Correct.
10 Q  Have you had any subsequent contact with the
11 police or --
12 A  Oh, yes.
13 Q  Okay. What other -- what other contact have
14 you had since then?
15 A  I have followed up with them over the course of
16 a year to encourage them to do their job.
17 Q  And what sort of response did you get?
18 A  They have filed a report. They have
19 contacted -- I could be wrong on the terminology here --
20 the legal system is the other system that I am not a
21 superstar in. I want to say it's the U.S. District
22 Attorney's office.