Page 38

1  Q. Her duties were limited to
2  accounting. Is that right?
3  A. Correct.
4  Q. As controller?
5  A. Yes. Or so I thought.
6  Q. Did she at any time during her
7  employment have any employees working for her
8  or under her in the accounting department, if
9  you will?
10  A. No, she did not.
11  Q. So she was the accounting
12  department.
13  A. Effectively.
14      MS. FREDERICK: Okay. Let's mark
15  this one.
16      (Marked, Exhibit # 4, Answers of
17  Plaintiff MDB Communications, Inc. to
18  Interrogatories of Defendant, Attachments.)
19      BY MS. FREDERICK:
20  Q. Ms. Hatch, I'm going to show you
21  what has been marked as your Deposition
22  Exhibit No. 4 which are Answers of the

Feder Reporting Company
(202) 863-0000

Page 39

1  Plaintiff MDB Communications to the
2  Interrogatories of the bank. And I just want
3  you to identify those and just let me know,
4  have you seen that document before?
5  A. Is there a date on here?
6  Q. There should be.
7  A. Yes, I have seen this document
8  before.
9  Q. Does your signature appear on Page
10  14?
11  A. It does.
12  Q. Did you assist counsel in
13  preparing the answers to the bank's questions
14  in this document?
15  A. I helped respond, yes.
16  Q. Was there anybody else in your
17  office that helped provide answers to the
18  questions in here?
19  A. Not that I recall.
20  Q. Can you turn to Answer to
21  Interrogatory No. 8. It's on Page 5.
22  A. Mmm-hmm.

Feder Reporting Company
(202) 863-0000

Page 40

1  Q. And in here I've asked you a very
2  similar question as I've just asked you today,
3  which were what were the duties of Marilyn
4  Essex, and as you've already told me today,
5  that she was hired in May of 1999 as
6  controller. Do you see that?
7  A. Yes.
8  Q. And it lists a number of duties
9  and responsibilities. Is it fair to say that
10  these are -- you have (a) through (s). Is
11  that a better, more comprehensive version of
12  the duties and responsibilities that she had?
13  A. Yes.
14      MR. NIEDERMAYER: Objection as to
15  form.
16      BY MS. FREDERICK:
17  Q. In No. 9 I asked specifically
18  whether Ms. Essex had the authority to sign or
19  endorse checks, to prepare checks and a lot of
20  other things. I guess what I want to know is
21  did Ms. Essex keep the checkbook, if you will,
22  for the company? Was there one checkbook for

Feder Reporting Company
(202) 863-0000

Page 41



1  each of these accounts that we've looked at,
2  the payroll account, the operating account,
3  escrow?
4  A. No.
5  Q. How were checks prepared for the
6  company?
7  A. Each account is different.
8  Q. For the operating account, let me
9  shop you there, what was the operating account
10  used for, do you know?
11  A. The operating account was the
12  account used for vendor payments, deposits.
13  Q. In other words, if you owed, the
14  company owed somebody some money, it would get
15  paid out of the operating account?
16  A. Correct, in most cases.
17  Q. How were checks prepared for
18  payments out of the operating account? I just
19  want to understand the difference. You said
20  there was no checkbook, but clearly there are
21  checks.
22  A. Correct.

Feder Reporting Company
(202) 863-0000

Page 42

1   Q. So how were checks generated?
2   A. There is a laundry list that is
3   prepared for me of checks that are to be run
4   at any given, usually every Friday, for my
5   approval. Once those are approved, they go in
6   to have the checks processed and then they
7   come to me for signature. In other words,
8   pulling information, you know, from A/P to
9   issue and print checks for my signature.
10  Q. Were the checks issued and printed
11  in your offices?
12  A. Yes.
13  Q. And did Ms. Essex have access to
14  those checks that were printed?
15  A. Yes.
16  Q. Okay.
17  A. As did I.
18  Q. Well, did you ever go into the
19  accounting office and print out checks? I
20  mean did you know how to use the system to
21  print out a check?
22  A. I did have the opportunity to

Feder Reporting Company
(202) 863-0000

Page 43

1   print out checks.
2   Q. How often would you do that?
3   Generally.
4   A. I don't even know how to answer
5   that question.
6   Q. Well, I mean from the time you
7   bought the company in 1987 to the present, how
8   many times would you go into whatever office
9   contained the machine or whatever that
10  generated your checks, to get a check
11  generated and sign it for somebody?
12  A. A couple times a month maybe.
13  Q. So not often but you are saying
14  two times a month you may go in and get a
15  check yourself and sign it, not for yourself
16  but you yourself would go in and generate a
17  check that would be payable to whoever.
18  A. A vendor usually.
19  Q. So you knew how to do it, in other
20  words, and you had access to it as well.
21  A. Correct.
22  Q. During the time that Ms. Essex was

Feder Reporting Company
(202) 863-0000

Page 44

1   employed was she the only other person that
2   had that same access?
3   A. Yes.
4   Q. Was there anybody else that could
5   go in and say, "Yeah, Cary needs me to get a
6   check. Marilyn's off today and I need to go
7   generate a check"? Was there anybody else
8   that could go in and generate a check for you
9   to sign?
10  A. No.
11  Q. When you say that you had a
12  laundry list that was presented to you, do I
13  understand that you were given a list of
14  people that needed to be paid and the backup
15  information for that and then the checks would
16  be generated?
17  A. Correct.
18  Q. And then once the checks were
19  generated, how were the checks brought back to
20  you? Each check had the backup information on
21  the back of it, that kind of thing?
22  A. Correct.

Feder Reporting Company
(202) 863-0000

Page 45

1   Q. So you could go through and see,
2   "Okay, here's..."
3   A. With the appropriate staff
4   approval, depending upon the vendor type.
5   Q. So you might have like a check
6   request and somebody had to sign off on it?
7   If it wasn't you, somebody else?
8   A. The media department, the
9   production department.
10  Q. Okay. Did you use a signature
11  stamp at any time?
12  A. No.
13  Q. At any time during the life of
14  your company?
15  A. No.
16  Q. Have you always been the person
17  that has signed every check that's gone out as
18  far as you knew?
19  A. Or so I thought.
20  Q. As far as you knew that went out.
21  A. Yes.
22  Q. At any time from the time you

Feder Reporting Company
(202) 863-0000

Page 46

1  purchased the company in '87 to the present,
2  was there anybody else that was authorized by
3  you to sign checks for the company?
4      A.  No, that I recall.
5      Q.  So your father's name or your
6  husband's name at some point in time would not
7  have appeared on any checks?
8      A.  I can't imagine that they would.
9      Q.  Well, your discovery mentioned
10 somewhere that you had an illness or were in
11 the hospital or something like that. I was
12 just wondering whether during that time were
13 you still signing checks?
14     A.  The good news is I have always
15 signed the checks because that was out of a
16 concern for, you know, something goes bad in
17 surgery you need to have somebody else in
18 place. But everything went fine.
19     Q.  Good, okay.
20     A.  So I signed the checks.
21     Q.  Okay. During the time that
22 Marilyn Essex was employed as the controller,

Feder Reporting Company
(202) 863-0000

Page 47

1  would she provide you with the laundry list
2  that you said, sort of the initial breakdown
3  of, "Okay, I'm going to print out these checks
4  on Friday," would she do that?
5      A.  Yes.
6      Q.  Then was she the one that
7  delivered to you the actual checks ready to
8  sign with the backup documentation behind
9  them?
10     A.  Correct.
11     Q.  And once you signed them how did
12 they get -- did they get back to Marilyn or
13 did your secretary send them out or how did
14 that go?
15     A.  I walked them next door to
16 Marilyn.
17     Q.  Marilyn then would take care of
18 putting the check in an envelope and mailing
19 it. Is that fair to say?
20     A.  Correct.
21     Q.  Just going back quickly to
22 Ms. Essex's employment agreement, do I

Feder Reporting Company
(202) 863-0000

Page 48

1  understand she was a part-time employee --
2      A.  Yes.
3      Q.  -- at that time, in 1999?
4      A.  Correct.
5      Q.  Did her hours increase at any time
6  during the period when she was employed by
7  MDB?
8      A.  They did.
9      Q.  And when was that?
10     A.  I'd have toe guess.
11     Q.  Don't guess.
12     A.  I can't tell you. I know they
13 increased. I can't tell you when.
14     Q.  Why did they increase?
15     A.  Because as the company grew we
16 needed more support in that area. And the
17 advertising business is very up and down.
18     Q.  Originally, how many days a week
19 did she work?
20     A.  I want to say she started out at
21 two. But at one point I believe it may have
22 gone up as high as four days a week.

Feder Reporting Company
(202) 863-0000

Page 49

1      Q.  Was she working four days a week
2  when she was fired in February of 2005?
3      A.  It was probably three days a week.
4      Q.  Okay.
5      A.  At that point.
6      Q.  Do I understand what you are
7  saying is her Employment Agreement says that
8  she's estimated to work part time at two days
9  a week and it probably was originally that and
10 then it may have gone up or down, depending on
11 the business of the, how busy your company
12 was, is that fair to say?
13     A.  Yes.
14     Q.  But at the time that she was
15 terminated, you think she may have been
16 working four days a week?
17     A.  I believe it was three.
18     Q.  Oh, three days, okay. Do you know
19 how long from the time she was terminated,
20 going back, how long she was working three
21 days a week or did it still go up and down?
22     A.  I'm sorry.

Feder Reporting Company
(202) 863-0000

Page 50

1   Q.  I'm trying to figure out how long
2  she was working three days a week, what period
3  of time was that between the time that started
4  and the time she was fired or whether it just
5  depended on how busy you were.
6   A.  **I don't really know the answer to**
7  **that question, to be honest.**
8   Q.  How did you keep track when she
9  was there and when she wasn't if sometimes she
10 was working three days and sometimes she was
11 working four days, and to pay her also?
12  A.  **Well, she received increases**
13 **during the period of time that she was with**
14 **the company and she and I would set the**
15 **schedule and the needs on a, you know, a**
16 **weekly or even monthly basis, depending upon**
17 **the health and the activity within the agency.**
18  Q.  Do you have an employee or
19 personnel file for Ms. Essex?
20  A.  **I believe we gave you everything**
21 **we have. It's not much.**
22  Q.  Well, that's what I wanted to go

Feder Reporting Company
(202) 863-0000

Page 51

1  into. I'll tell you what I have. I have an
2  Employment Agreement, a couple of memos that
3  pertain to when she was let go, fired, and a
4  couple of pages of handwritten notes, and
5  maybe a couple memos saying, "We're going to
6  increase your salary" or "We're going to give
7  you a bonus" or something, at the end of the
8  year. Is that all you have with regard to
9  her?
10  A.  **Yeah. To the best of my**
11 **knowledge, that's it.**
12  Q.  Who keeps the personnel records in
13 your company?
14  A.  **I usually keep a copy and then**
15 **there's a copy in the accounting department.**
16  Q.  Did you ever do any performance
17 evaluations with regard to Ms. Essex?
18  A.  **I did.**
19  Q.  Were they written?
20  A.  **No.**
21  Q.  Did you prepare any memos
22 memorializing the evaluation in any way?

Feder Reporting Company
(202) 863-0000

Page 52

1   A.  **Not in her case, no.**
2   Q.  Why is that?
3   A.  **Primarily because of her part-time**
4  **capacity.**
5   Q.  Did you set up a regular schedule
6  of evaluations of Ms. Essex while she was
7  employed?
8   A.  **No.**
9   Q.  In other words, did you say,
10 "Okay, let's just agree that every six months
11 we're going to have a talk and see how
12 everything is going"?
13  A.  **MDB Communications does annual**
14 **reviews. For people on a part-time status**
15 **it's usually annual. But for full-time**
16 **employees, we usually do a six-month and then**
17 **an annualized review.**
18  Q.  But it's your testimony, though,
19 that there are no written memos of any
20 discussions you had with her with regard to
21 any performance evaluations you may have had
22 with her while she was employed.

Feder Reporting Company
(202) 863-0000

Page 53

1   A.  **No.**
2   Q.  With regard to any performance
3  evaluations or evaluations of her employment
4  while she was there, do you recall any of
5  those meetings and what was discussed?
6   A.  **I don't.**
7   Q.  Were there any issues that you had
8  with her, issues meaning problems or
9  constructive criticism that you may have had
10 that you would have raised at some point
11 either in an evaluation or informally at
12 another time?
13  A.  **It's doubtful. I got very regular**
14 **reporting from her, because she knew how**
15 **important it was to me.**
16  Q.  When you say you got regular
17 reporting, what does that mean?
18  A.  **The monthly statements, the P&L**
19 **statements, the weekly cash position**
20 **statements, you know, A/P, A/R, you know,**
21 **relative cash available for the company.**
22  Q.  So did you feel she was a good

Feder Reporting Company
(202) 863-0000

Page 54

1  employee then?
2  A. I did.
3  Q. In other words, you didn't have a
4  lot of issues or problems. Clearly, there is
5  nothing in the file, if there is one, that I
6  have that shows that she had problems or you
7  had to reprimand her or she didn't get her
8  reports on time, there was nothing of that
9  nature.
10 A. Nothing of that nature.
11 Q. When she was hired, prior to the
12 time that you decided to hire her and sign the
13 agreement, did you do any background check on
14 her or reference check?
15 A. She came recommended from one of
16 my best friends in the industry, another
17 agency owner who had known her in the position
18 as controller or bookkeeper at a client's
19 place of business.
20 Q. Where was she from? Where did she
21 previously work?
22 A. Sport & Health.

Feder Reporting Company
(202) 863-0000

Page 55

1  Q. Sport & Health?
2  A. Yes.
3  Q. Is that a business?
4  A. It's a business. Actually, as I
5  understand it, it has a complex partnership
6  model that it uses. I'm sure you're familiar
7  with Sport & Health. They do a tremendous
8  amount of advertising. It's a fitness center,
9  if you will. They have multiple locations and
10 they are run by a partnership. She helped
11 direct and manage accounting people within
12 their accounting division.
13 Q. So are you saying you knew
14 somebody at Sport & Health that said, "Yeah,
15 this woman is really good"?
16 A. I knew somebody in my industry,
17 another advertising agency owner who
18 recommended her, because he used to have the
19 Sport & Health account. So that was an
20 important recommendation.
21 Q. Do you know why she left her
22 former position prior to coming to MDB?

Feder Reporting Company
(202) 863-0000

Page 56

1  A. As I understood it, she wanted to
2  have more flexibility in her schedule and to
3  pursue an advanced degree.
4  Q. Do you know what degree she had
5  when she signed on with you?
6  A. I can't tell you off the top of my
7  head. I believe it was a general business
8  degree.
9  Q. Was she a CPA?
10 A. No.
11 Q. Did she ever become a CPA or get
12 any type of advanced degree while she was
13 working for your company?
14 A. She certainly did.
15 Q. Okay. What happened with regard
16 to her education?
17 A. She has an MBA from Johns Hopkins,
18 which I paid for.
19 Q. Did she also become a CPA, do you
20 know?
21 A. I don't believe so.
22 Q. Other than the reference from

Feder Reporting Company
(202) 863-0000

Page 57

1  someone in the industry -- is that how she was
2  referred to you? In other words, did you
3  advertise looking for somebody to replace your
4  former controller?
5  A. I believe we did. Our experience
6  has been the best candidates and the best
7  employees come through referrals, though,
8  particularly in my industry.
9  Q. Other than the reference that you
10 got from someone else in the industry, did you
11 do any type of background check on her or
12 anybody in your office?
13 A. No.
14 Q. Criminal records check?
15 A. I wasn't even familiar with
16 criminal records checks.
17 Q. Did she have a resume? Because I
18 didn't see that in your file either.
19 A. I want to say she did. I don't
20 have it. But I vaguely remember she had a
21 resume.
22 Q. Since this whole fraud scheme

Feder Reporting Company
(202) 863-0000

Page 70

1  A. We sent signature cards to Karen
2  and Gary was in the office. So that's how
3  they were executed.
4  Q. Gary was in the office to sign.
5  You said Karen Kennedy wasn't. Was she not an
6  employee?
7  A. She's a financial advisor to my
8  firm.
9  Q. Did she work with one of those two
10 companies you previously mentioned, Beers or
11 Lindstrom?
12 A. No. Well, she's a general advisor
13 but she's also a financial advisor. She's an
14 independent consultant who successfully ran an
15 advertising agency for 30-some-odd years.
16 She's another advertising --
17 Q. How long has she been a financial
18 advisor for the company?
19 A. I should correct that. She's more
20 of a management/financial advisor. Since
21 2001, I believe.
22 Q. Is she an employee?

Feder Reporting Company
(202) 863-0000

Page 71

1  A. No. She's a consultant.
2  Q. So she's a paid consultant but not
3  an employee.
4  A. Correct.
5  Q. So in January 2005 what did you
6  need to do to effectuate the wire transfer you
7  were seeking?
8  A. I needed to reinitiate a signatory
9  card and fax over the bylaws of my company.
10 Q. Let's mark this stack as the next
11 exhibit. I'm going to let you and your
12 counsel flip through that stack. It needs to
13 go together. That's why I'm doing it that
14 way. So take a minute and look it over,
15 please.
16 A. Yes. This is Sonja.
17     (Marked, Exhibit # 6, Business
18 Signature Card, Attachments.)
19     BY MS. FREDERICK:
20 Q. Ms. Hatch, I'm showing you what
21 has just been marked as your Deposition
22 Exhibit No. 6. For the record, it's a Bank of

Feder Reporting Company
(202) 863-0000

Page 72

1  America signature card for the account ending
2  in 8654. And then attached are a series of
3  MDB-produced documents, MDB 160 through 171.
4  The first document on the top of this stack
5  that I've just marked is a business signature
6  card. Do you see that?
7  A. Yes.
8  Q. It's for Account No. 8654. Do we
9  agree that that's the operating account?
10 A. I believe it is.
11 Q. Okay. Does your signature appear
12 on this document?
13 A. It does.
14 Q. And I think, again, we can also
15 agree that there's no date on this document.
16 Is that right? Down where it says, Date,
17 Banking Center Name, Associate's Name, all
18 that, there is no date filled in. Do you see
19 that?
20 A. Yeah, you are right.
21 Q. The documents that follow it were
22 produced by your counsel and they are in the

Feder Reporting Company
(202) 863-0000

Page 73

1  order of the way they were produced. And they
2  include the business card of Ms. Mosley which
3  we already marked, and then a fax coversheet
4  which is followed by a Unanimous Written
5  Consent of the Board of Directors of MDB.
6  A. Right.
7  Q. Another fax sheet, which is MDB
8  164, followed by the Certificate of
9  Incorporation for MDB, followed by at MDB 169
10 a copy of an American Express card and a
11 driver's license, followed by a fax to
12 Cassandra Goodman and, finally, it looks like
13 a fax confirmation sheet or some such, I don't
14 know. I'm going to ask you about these
15 documents, but that's what's in the stack.
16     In January of 2005 as you said in
17 your affidavit, we just discussed it, did you
18 go in and talk to Sonja, was it Sonja that you
19 talked with about the wire transfer and there
20 was the whole issue of you not being the
21 signatory and having to redo the card? Is
22 that right?

Feder Reporting Company
(202) 863-0000

Page 74

1  A.  I believe that's correct.
2  Q.  I think you said earlier that you
3  faxed information over to her. Does this fax
4  sheet to Sonja from you on January 28, 2005,
5  does that ring any bells?
6  A.  It does.
7  Q.  Is it fair to say then that you or
8  somebody on your behalf faxed over the
9  Unanimous Written Consent of the Board of
10  Directors of MDB on January 28, 2005?
11       MR. NIEDERMAYER: Objection as to
12  form.
13       BY MS. FREDERICK:
14  Q.  You can answer.
15  A.  Yes.
16  Q.  And then there is the Certificate
17  of Incorporation of MDB which is a multi-page
18  document, followed by your American Express
19  card and your license. Do you see that?
20  A.  Yes.
21  Q.  The driver's license number and
22  issue date appear to be the same as the

Feder Reporting Company
(202) 863-0000

Page 75

1  driver's license, the copy that's attached.
2  Do you see that?
3  A.  Yes.
4  Q.  As well as your American Express
5  card which is on here with an expiration date,
6  it has the last five numbers and an expiration
7  date on the signature card as compared with
8  the actual Xerox copy of the card that you
9  produced.
10  A.  Correct.
11  Q.  Is it fair to say, though, then
12  that most likely you executed this signature
13  card on or about January 28, 2005?
14       MR. NIEDERMAYER: Objection as to
15  form.
16       THE WITNESS: I'm not sure I
17  totally understand, because I think what I
18  sent to Sonja was on January 28th. I want to
19  make sure that this other document with
20  Cassandra is April.
21       BY MS. FREDERICK:
22  Q.  Right.

Feder Reporting Company
(202) 863-0000

Page 76

1  A.  So maybe I'm missing your point.
2  I'm sorry.
3  Q.  Taking these last two pages aside
4  because there appears to be no documents
5  attached to the fax coversheet to Cassandra,
6  but the American Express card and your license
7  has the same information that appears on the
8  signature card which is the first page.
9  A.  Five plus cover. That's this
10  document. This is that document. That's I
11  guess what I am -- you see what I'm saying?
12  This is three plus cover and this is when that
13  was transmitted. This is five plus cover and
14  this is when this was transmitted.
15  Q.  Let's for the record so we
16  understand what has been transmitted, the
17  three plus cover you were transmitting to her
18  the Unanimous Written Consent, is that what
19  you are saying?
20  A.  Yes. And that's got a
21  confirmation number. So that's that document.
22  Q.  Right. And the confirmation is

Feder Reporting Company
(202) 863-0000

Page 77

1  128.
2  A.  Correct.
3  Q.  Now, the signature card there
4  appears. It has your driver's license number.
5  You were issued an expiration date and an AmEx
6  card information. Does that not match up with
7  the Xerox of the AmEx and the driver's
8  license?
9  A.  Yes, it does match up.
10  Q.  Is it fair to say that on or about
11  January 28, 2005 is when you executed this
12  card which is the top sheet of this exhibit?
13       MR. NIEDERMAYER: Objection as to
14  form.
15       THE WITNESS: I can't say that. I
16  don't know that. I agree that this is this
17  information. All I'm telling you is that it
18  would make logical sense but I can't --
19       MR. NIEDERMAYER: Just tell us
20  what you recall.
21       THE WITNESS: See, I don't know
22  that this went with that.

Feder Reporting Company
(202) 863-0000